## CHARLES E. KNIGHT *vs.* CHARLES L. WILDER.

Arbitrators appointed under a rule of court have authority, if they think proper, to refer questions of law, decided by them, to the revision and adjudication of the court.

A riparian proprietor, upon a river not navigable, has a fee in the soil, subject to the right of the public to make use of the water for boating, rafting, and the like purposes, to the thread of the stream, whether so expressed in the grant or conveyance under which he holds or not; and such proprietor may sell and convey his estate in the bed of the river, separate from the upland, or his upland, without the bed of the river, and may divide and dispose of the latter, as well as of the former, in any form, or by any lines, which he may think proper.

In running out the side lines of a riparian proprietor, on a river not navigable, they are to be extended from their respective *termini* on the shore, at right angles with the course of the river, to the centre of the stream; unless otherwise established by the terms of the grant or conveyance under which he holds.

THE questions considered by the court in this case, which was an action of trespass to land referred by a rule of court to the Hon. John Davis, and Anthony Chase, Esq., of Worcester, and Moses Sawyer, Esq., of Sterling, arose upon the award of the arbitrators. The order of reference contained the following clause : — " The arbitrators shall determine and award as to the limits and boundaries of the lands of the respective parties, upon and near which said trespasses are supposed to have been committed, and as to all the rights of the parties to the use of the water in the stream running on or through said lands, and may award that either or both parties shall give deeds and what deeds for the purpose of settling and quieting all the rights of the respective parties."

The facts of the case are sufficiently stated in the award, which is as follows : —

" The action is trespass for removing the foundations of a mill dam on Nashua River, near Pomkin Bridge, in Lancaster ; and the matter chiefly contested between the parties was the boundaries of a tract of land supposed to contain about ten square rods, consisting principally of the bed of the river.

" The river runs nearly from north to south, and the *locus in quo* is immediately south of the bridge.

" Israel Houghton being the owner of a farm upon the west bank of the river, the highway which crosses the stream at said bridge was laid out across the south-easterly angle of said farm, and severed therefrom the tract in question. In 1809, Israel Houghton, being then the tenant in fee of said farm, executed with Aaron Jones a deed of two parts, whereby he leased to said Jones, his heirs and assigns, all the land divided from said farm by said road, containing about ten square rods ; and Jones was to keep up a grist mill thereon, so long as he improved the same. A mill was erected, and the premises, after having been several times conveyed, were in 1822 conveyed to the plaintiff, who became the tenant under the lease or agreement with Jones, and entered into and enjoyed the same in connection with a farm

owned by him upon the east bank of the river. But the mill, having become dilapidated, ceased to be used for a number of years, whereby the lease was terminated by its own limitation. The defendant, about this time, purchased the Houghton farm, together with the premises in question. The title to the estate being thus vested in him, he entered and removed a portion of the timbers of the dam which were west of the centre of the river; and this is the alleged trespass.

" The plaintiff admits that the defendant is the lawful owner of the premises covered by the lease, and had a right to remove any obstructions to the water thereon. But while he concedes this right, he denies that the whole or a principal part of the foundations of the mill and dam, as erected and maintained, are upon those premises; and in fact alleges, that a large portion of the site is lower down the river, and upon other land to which neither said Houghton nor his assigns had any right; and he further alleges that the portion of the site so below the leased premises is sufficient to enable him to maintain a dam thereon, and to raise a head of water suitable to work a mill. And he averred that he could thus maintain a head of water independent of the lease, and had a right so to do, and to flow the land above, because he, and those under whom he claimed, had used and enjoyed this portion of the site for more than twenty years. These assumptions raised several questions, which were discussed by the parties, the principal of which related to the boundaries of the leased premises.

" It appears by the proprietors' record of the survey of Houghton's farm, made in 1738 – 9, that the description commences at a red oak tree by the river, above the red spring, and the line runs thence west twenty-one degrees north sixteen rods, to a white oak tree at the next angle. This red oak tree was the monument for the south-west angle of the farm, which was severed from it by the road. No vestige of either of these trees remains, but the fence is standing upon a large portion of this line of sixteen rods, and indicates distinctly the angle where the white oak stood. Following,

therefore, from this point the general range of the fence, which is south sixty-eight degrees east, for sixteen rods, we came to what we consider to be the site of the red oak tree, and there set up a long slate-colored stone with a cross cut near the top. From this point, the plaintiff contended that the line should be extended to the thread of the stream, so as to intersect it at right angles therewith. The defendant, on the other hand, contended that it should be extended to the thread of the stream without change of course. Mr. Sawyer, one of the arbitrators, traced a line at right angles with the west bank, from the site of the red oak tree to the opposite bank. The course is north eighty-five degrees east, and it fell upon the north end of a large slate-colored rock lying upon the sand, into which we cut a cross. We also traced from the same point the other line on the course south sixty-eight degrees east to the opposite bank, where we set into the earth, in a field, a stone with a cross cut at the top.

" The first mentioned of these lines across the river passes over the site of the mill and dam diagonally, but leaves the foundations entirely, and passes into the stream at or near to the centre or thread of the river. The other line does not touch the site of the original mill and dam, but cuts diago- nally the foundations of a small building added thereto below the original site. The result is, that the line drawn according to the theory of the plaintiff does not exclude from the leased premises any such portion of the site of the mill and dam as would enable him to construct or maintain a dam thereon. The portion excluded is an acute-angled triangle, with the sharpest point towards the centre of the stream, but probably falling short of it ; so that there would be, in that case, no union or connection between the portion of the site thus sep- arated and the foundations of the dam east of the thread of the river ; but if it extends to the thread, no dam could be maintained upon it. The consequence is, that the plaintiff did not, independently of the lease, occupy land upon which he can now maintain a dam, and keep up a head of water suita- ble to work a mill

" But we are required to establish the boundary line between the parties, and this will be sufficiently complied with, by deciding which of the above lines from the site of the red oak tree to the centre of the river is the true line.   It is a principle unquestioned, that if land is bounded on or by a river which is not navigable, the thread of the stream becomes the boundary ; although the monuments are placed upon the bank, the law carries the grant to the centre.   It supposes the monuments to be upon the bank, because they cannot be safely placed in the stream.   They are in fact as near to the end of the lines as they can be, and when the law carries the grant to the centre, it in effect moves these monuments forward, in the course of the lines upon which they stand, to the points where they intersect the thread of the river.   We find no authority which countenances a change of the course, or intimates that the thread of the stream is to be intersected at right angles.   On the contrary, the case of *Ipswich, Petitioners*, 13 Pick. 431, supports fully the views which we take.

" We therefore award and decide as follows : —

1.  That the site of the red oak tree, which stood by the river, is where we placed a slate-colored stone about two feet long in the ground, with a cross near the top, which is sixteen rods from the angle in the fence where the white oak stood, and that the general range of the fence from the angle to said stone is south sixty-eight degrees east.

2.  That this line shall be continued straight upon the same course to the thread of the stream ; and if so subtended to the upper bank upon the opposite side of the river, it will come to a stone there set up by us, with a cross marked upon the top.

3.  This, we are of opinion, is the boundary of the defendant's premises, from the site of the red oak tree to the centre or thread of the stream.

4.  That a line thus run does not exclude from the defendant's premises any such portion of the site of the mill and dam, as would enable the plaintiff, by any structure there-

on, to maintain or keep up a head of water to work a mill, and consequently that the plaintiff acquired no right to maintain a dam upon the foundations where the structure stood, or to flow the water back, except under the provisions of the lease.

5. That the defendant, having a right to enter upon the premises after the lease expired, might lawfully remove therefrom any obstructions to the passage of the water; and if such obstructions consisted of timbers lying in part upon the premises of the plaintiff, still they might be lawfully removed, if in so doing no unnecessary damage was done to the plaintiff.

6. We find no evidence tending to prove that unnecessary injury was done, and therefore find that the defendant is not guilty of the trespass set forth in the declaration.

"In compliance with a request made by the plaintiff's counsel, we leave our decision of the legal question respecting boundaries open to the revision of the court, if we have authority so to do."

*R. Newton*, for the plaintiff. The arbitrators have erred in consequence of not adverting to the origin of the rights of riparian proprietors in the bed of a river. These rights pass as incident to the land on the bank, and not directly by force of the deed, and had their origin, as appears by the old authorities, in the right of fishery. It was early held, that a conveyance of the land on the bank of a river gave the owner a right of fishery to the thread of the river; and it was soon after held, that the owner of a fishery was to be deemed the owner of the land, which was covered by the water, wherein the right to fish existed. These principles lie at the foundation of the rights of riparian proprietors, and fully establish the claim of the plaintiff, in the present case. *Co. Lit.* 122 b, note 7; *Carter* v. *Murcot*, 4 Bur. 2162; 3 Kent, 411 (4th ed.); *Partheriche* v. *Mason*, 2 Chit. R. 658; *Hooker* v. *Cummings*, 20 Johns, 90, 99; *Ex parte, Jennings*, 6 Cow. 518 and note on page 536.

According to lord Hale, *de Jure Maris, c.* 1, the right to

fish is coextensive with the line of propriety on the bank; and, in order to get at its extent in the bed of the stream, lines are to be drawn from those points on the bank where the shore lines terminate, at right angles with the bank, to the thread of the river. The case of *Carter* v. *Murcot*, before referred to, was decided upon these principles, and the modern cases regard that case as settling the law on the subject. *Carson* v. *Blazer*, 2 Binn. 475; *Shrunk* v. *Schuylkill Nav. Co.* 14 S. & R. 71; *Hatch* v. *Dwight*, 17 Mass. 289; Angell on W. C. *c.* 1. All that is contended for by the plaintiff in this case is that the bed of the river should be divided in this manner. Any other mode of division would be both absurd and inconvenient. That contended for by the defendant would operate, in some cases, to give the riparian proprietor very little, and in others, to give him none at all, of the bed of the river. The rules of this court, adopted for dividing flats and alluvion, cannot be carried out, except upon the principles contended for by the plaintiff. *Ingraham* v. *Wilkinson*, 4 Pick. 268; *Rust* v. *Boston Mill Dam Corp.* 6 Pick. 158; *Ipswich, Petitioners*, 13 Pick. 431; *Deerfield* v. *Arms*, 17 Pick. 41; *Emerson* v. *Taylor*, 9 Greenl. 42.

*C. Allen*, for the defendant. The arbitrators having passed upon every thing referred to them, and having made an award which settles the whole matter, the court will not now, even if they have jurisdiction, be inclined to disturb the award, unless there be something palpably wrong in it. The arbitrators predicate their decision, in part, upon the authority of the case of *Ipswich, Petitioners*, 13 Pick. 431; and the case of *Dawes* v. *Prentice*, 16 Pick. 435, comes still nearer settling the principle, upon which they proceeded, than the case relied on by them. Besides, the parties might have created a conflict of right by their conveyances. How, then, can it be said, that the arbitrators are so manifestly in error, as to make it necessary to recommit their award?

*Newton*, in reply, said that if the arbitrators had awarded generally, there would have been no question of law for the

court ; but having specially referred the matter of law to the court, their award was properly open to revision.

The opinion of the court was delivered at the April term, 1849.

Shaw, C. J. The arbitrators, to whom this case was referred, have by their award submitted to the court a question of law, if by law they have authority to do so. Of this authority we can have no doubt, and when the submission is by a rule of court, it is not uncommon for arbitrators to exercise such authority. When arbitrators have thus submitted a question of law to the court, it is manifest that their intention was to act conformably to law ; and if, upon examination, it appears that they have decided against law, then it is obvious that the award does not express their real judgment, and is not the result which they intended.

The case referred was an action of trespass, for a trespass alleged to have been committed by the defendant in removing a part of the foundation and materials of a mill dam ; and whether the action can be maintained depends upon a question of the boundary line of the estates between the parties. If the part of the dam removed by the defendant was on the land of the plaintiff, the act was a trespass ; if on his own land, the plaintiff has suffered no wrong, and has no cause of action. By the agreement of the parties, and the rule of court founded upon it, the arbitrators, in addition to adjudicating upon the action, were authorized and required, as a part of their duty, to ascertain and determine the boundary line between the parties.

It appears that the defendant Wilder had become the proprietor of an estate known as the Houghton farm, in Lancaster, lying on the west side of the Nashua River. The bulk of the farm lay above a road and bridge, which crosses the river on a line nearly east and west ; but a small piece or gore, constituting the south-eastern angle of the Houghton farm, and consisting mostly of land lying in the bed of the river, had been separated by the laying out of the road from the

rest of the farm.   This small gore, which was described as containing about ten square rods, had been leased to be used in connection with other land, on the opposite side of the river, for the erection of a mill, the lease to continue so long as a grist mill should be kept up on the same.   The grist mill was kept up for some time, and was then discontinued; by means of which the small parcel of land reverted to the proprietor of the Houghton farm.

The plaintiff, as we understand, had acquired a title to the land on the opposite or easterly side of the river, and also to the land on the westerly side of the river, lying adjoining and below the small lot.

It is conceded on all hands, that the Nashua is a river not navigable, and that by the general rule of law, the riparian proprietors respectively own the soil to the thread of the stream, or *filum aquæ.*

The question for the arbitrators was, in what direction the boundary line should run from a fixed monument on the bank of the river; whether on a line at right angles with the river; or whether it should run diagonally, following the upland line.   The adoption of the former rule would exclude the place where the trespass was alleged to be committed, — the site of the greater portion of the mill and dam, — from the premises of the defendant, and would show that the act was unjustifiable, and that the plaintiff was entitled to recover.   The adoption of the latter, — the diagonal line, — would bring the place within the premises of the defendant, and would thus prove that the act complained of was done on his own land, and was accordingly justifiable.

The question is clearly stated by the arbitrators.   They give a description of the Houghton farm from a survey made and recorded in the proprietors' records in 1738, and no act is shown to have been done since that time, by the conterminous proprietors, to change the line as then established. From this description, it appears that the line commences at a red oak tree by the river, above the red spring, and that the line runs thence west, twenty-one degrees north, sixteen

rods, to a white oak tree at the next angle. This red oak tree was the monument for the south east angle of the farm, which was severed from it by the road. The arbitrators further state, that no vestige remains, either of the red oak by the river, or of the white oak sixteen rods back from the river; but from other satisfactory evidence, they have been able to ascertain the sites of both of these monuments. They then state, that beginning at the site of the white oak, back from the river, and running sixteen rods towards the river, they came to the site of the red oak, and there set up a monument. From that point, they extended two lines across the river; one in a direction at right angles with the river, which is here stated to be straight, or nearly so; and the other by continuing the line from the white oak to the red oak, in the same direction diagonally across the river; and at the end of each of these lines, on the opposite side of the river, they set up a fixed monument. It is obvious, that the latter line would strike the thread of the stream at a point lower down than the former, and thereby give a greater extent to the south-easterly angle of the Houghton farm.

From this point, — the site of the red oak tree on the bank of the river, — the plaintiff contended, that the line should be extended to the thread of the stream, so as to intersect it at right angles therewith. The defendant, on the other hand, contended, that the line should be extended to the thread of the river, from the site of the white oak tree, through the site of the red oak tree, without change of course.

We take the rule of law to be, that upon a river not navigable, the riparian proprietor has a fee in the soil, subject of course to a public easement for boating and rafting, and the like purposes, to the thread of the stream, whether expressed in the grant or conveyance under which he holds the land or not; and it follows, therefore, that where the line of the shore is straight, each of such proprietors will have a length of line, at the thread of the stream, equal to his length of line on the shore; but in case of a curved line on the shore, either convex or concave, his line at the thread of the stream will

be longer or shorter, respectively, than his shore line. We are also of opinion, that when there is nothing in the conveyance to modify the rule, that rule is, that the side lines of each riparian proprietor must extend from the *termini* of his lines on the shore, at right angles with the course of the river, to the thread of the stream. No doubt the owner of land so situated, having himself an estate in fee in the bed of the stream to the thread of it, may sell his estate in the bed of the river, without his upland, or his upland without the bed of the river; and such conveyance will be good and available. It follows, as a necessary consequence, that such owner may convey a part of his estate in the bed of the river, and may divide it in any form, or by any lines, which he may think proper. We therefore state the rule, as to the adopting of lines running at right angles, as applicable to a case in which the lines are not otherwise established by the terms of the grant, under which the riparian owner holds. But *prima facie*, and independently of such modification in particular cases, the general rule must be to take lines, at right angles with the course of the stream, to its thread or middle line. The same rule applies to the analogous case of the division of flats, in Massachusetts, under the colony ordinance. *Rust* v. *Boston Mill Corp.* 6 Pick. 158; *Deerfield* v. *Arms*, 17 Pick. 41; *Emerson* v. *Taylor*, 9 Greenl. 42. In the first and last of these cases, the point of the decision was, that the direction of the side lines of the riparian owner upon the upland towards the river is not to be regarded, in extending the line into the river; but regard is to be had only to the length of the proprietor's line on the shore. This, we think, is the true rule.

The same rule was recognized and adopted in the case of *Sparhawk* v. *Bullard*, 1 Met. 95, 106. This rule assumes, that, in the absence of any direction given by the proprietor's grant, and where the shore is straight, the course is to draw lines from the *termini* of the proprietor's lines on the shore, at right angles, to determine his right to flats. And we think the rule is well founded in principle. The object is to give

18 *

*to each riparian* proprietor an equal share of the bed of the river, in proportion to his line on the margin of the stream, together with that portion of the bed of the stream, which lies opposite, in front of, or adjacent to, his upland ; and this, in the absence of any controlling grant, will be effected by the straight lines, at right angles, which will in general be the shortest and most direct lines, to the thread of the stream. And we cannot perceive how this consideration can be influenced by the shape of the upland lot, or by the direction of its side lines back from the river.

In applying this rule to the present case, the court have not been able to perceive any thing in the description of the Houghton farm, which, by expression or implication, gives a direction to the line from the red oak, on the margin of the river, towards the bed of the stream ; and therefore the general rule of construction must prevail. The survey of the farm, as filed with the proprietors in 1738, is referred to as a correct description, and nothing has since occurred to vary it. This description began at the red oak, by the river, above the red spring, and from thence ran west, twenty-one degrees north, to a white oak, bounding, &c. ; and thence by various corners and distances to a black oak, bounding, &c. ; from thence down the river, bounding on the river and intervale, to the red oak where it began.

In this description, there is no conveyance in terms of any portion of the bed of the river ; and it is only by implication of law, that one half of the bed of the river passes ; because the estate conveyed is bounded on the river, and the rule of law already stated fixes the lines to be at right angles to the stream, from the several *termini* on the margin. This description is very much like that stated in the case of *Ipswich, Petitioners,* 13 Pick. 431. In that case, as in this, it was held, that when the river was given as a boundary, it must be understood to be the thread of the river. But as the central line or thread of the river could never come to the red oak on its bank, it must be held, by a reasonable construction, to be a point directly opposite to the monument. In that case,

it was said, " or at that point, at which the line of the wall, if protracted at right angles with the river, would intersect the central line of the river." The wall, we believe, in that case, was nearly or exactly at right angles with the river ; so that the line of the wall, and a line at right angles with the river, were equivalent expressions. Still, it may well be admitted, that the word " protracted " was carelessly used, and that the term " extended " or " drawn " would have expressed the idea intended more exactly ; inasmuch as the word " protracted," when unqualified, means the extension of a line in its original direction. But in the same sentence, the word is qualified by the expression " at right angles with the river." And such, we have no doubt, was the judgment of the court in that case. Thus explained, that case, we think, is an authority confirming the general rule of law, as above stated.

The court are therefore of opinion, that the arbitrators erred in matter of law, in taking the diagonal line, drawn to the lower monument, set up and described by them on the opposite side or east bank of the river ; that they should have taken the direct line described by them to the upper monument, on a line drawn at right angles with the river ; and that the report ought to be recommitted to the arbitrators, to enable them to reconsider and revise their finding in this respect

*Award recommitted.*